UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARMEN MARIE FABER,

            Plaintiff,

v.                                              Case No.  5:08-cv-260-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

            Defendant.

_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions. (Docs. 19 & 20.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On October 10, 2003, Plaintiff filed an application for a period of disability, and disability insurance benefits, alleging a disability onset date of June 1, 1993. (R. 61-64.) Plaintiff's application was denied initially and upon reconsideration. (R. 27-30, 36-41.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 35.) The ALJ conducted Plaintiff's administrative hearing on January 20, 2006. (R. 767-81.) The ALJ issued a decision unfavorable to Plaintiff on October 31, 2006. (R. 13-26.) Plaintiff's request for review of the hearing decision by the Social Security

Administration's Office of Hearings and Appeals was denied.  (R. 5-8.) Plaintiff then

appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

 evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do

more than merely "create a suspicion of the existence of [a] fact," and must include

"such relevant evidence as a reasonable person would accept as adequate to support

the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[3] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[4] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, he is disabled.[11] Fourth, if a claimant's impairments do not

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits her or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996,
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was sixty one (61) years old at the time of the ALJ's decision on October 31, 2006. (R. 13-26, 62, 769.) She has a high school education and one year of college education. (R. 68, 82, 769-71.) She has previous work experience as an inventory control clerk. (R. 68, 769-71.) Plaintiff contends that she has been unable to work since June 1, 1993 due to arthritis, scleroderma, leg length discrepancy, history of thyroid cancer, and lower back pain. (R. 62, 67.) Plaintiff is insured for benefits through December 31, 1998. (R. 59.)

---

[17](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] <u>Walker v. Bowen</u>, 826 F.2d at 1003.

[19] <u>Wolfe</u>, 86 F.3d at 1077-78.

[20] *See* <u>id</u>.

[21] *See* <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, and written testimony from an impartial medical expert, the ALJ determined that Plaintiff suffers from hypothyroidism secondary to thyroidectomy, degenerative disc disease of the neck and back, mild degenerative joint disease of the hands with mild right carpal tunnel syndrome, a history of bronchitis, status post right lower extremity fracture with rodding, and scleroderma with morphea of the left lower extremity. (R. 18.) While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. Specifically, the ALJ carefully considered all of Plaintiff's impairments both individually and in combination and found that the objective medical evidence failed to establish that Plaintiff met or medically equaled the criteria set forth in Sections 1.00, 3.00, 8.00, and/or 9.00 of the Listings of Impairments. (R. 22.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of light work. The ALJ limited Plaintiff to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking (with normal breaks) for a total of about six hours in an eight hour workday; sitting (with normal breaks) for a total of about six hours in an eight hour workday; pushing and/or pulling no more than twenty pounds occasionally with the lower extremities and frequently with the upper extremities; climbing ramps and/or stairs, stooping, kneeling, crouching, and/or crawling occasionally; balancing frequently; and never climbing ladders, ropes and/or scaffolds.

The ALJ further found Plaintiff had no manipulative, visual, or communicative limitations. (R. 22.)

After finding that Plaintiff could perform her past relevant work as an inventory control clerk as it was actually and generally performed, the ALJ concluded that Plaintiff was not disabled through the date last insured. (R. 26.)

### Medical Evidence

Plaintiff raises two issues in her appeal both of which pertain to her mild degenerative joint disease of the hands with mild right carpal tunnel syndrome. The Court will limit its discussion of the medical records accordingly.

Plaintiff initiated treatment with Dr. Stephen Rosenfeld, an immunological disease specialist, in July 1992. Test results from that initial visit revealed a slightly elevated rheumatoid factor suggestive of systemic lupus erythematosus ("SLE").[22] (R. 271-72.) A year later, in July 1993, Plaintiff returned for follow up treatment advising that she had been doing "quite well." Plaintiff further advised that her current medication, Relafen, had helped decrease her joint symptoms. In fact, Plaintiff reported that she had been doing a lot of walking with her guests visiting from Holland. (R. 269.)

X-rays of Plaintiffs hands taken in January 1995 revealed mild degenerative changes in the proximal interphalangeal ("PIP") joints of the middle fingers as well as in the distal interphalangeal ("DIP") joints of the index finger. However, there was no evidence of fracture, bone erosion, or destruction. (R. 139.)

---

[22] SLE is defined as an inflammatory connective tissue disease characterized by symptoms such as weakness, fatigue, and joint pains. STEDMAN'S MEDICAL DICTIONARY 1124 (28th ed. 2006).

Plaintiff returned for follow up treatment with Dr. Rosenfeld in June 1996 reporting that while she was experiencing pain in her second finger on the left, the pain was relieved by Relafen. Examination revealed an increase in the size of the PIP joints of Plaintiff's second fingers bilaterally. (R. 265.)

In August 1997, during an annual physical examination with her primary care physician, Dr. Robert McVeigh, Plaintiff reported feeling better than she had in years secondary to her participation in physical therapy. Examination of Plaintiff was unremarkable and Dr. McVeigh noted that Plaintiff's lupus had stabilized on medication. He further noted that her blood work was within normal limits. (R. 204.) In November 1997, Plaintiff returned to Dr. McVeigh with complaints of severe bilateral arm pain that had progressively gotten worse over the course of the previous couple of months. Dr. McVeigh referred Plaintiff to a neurologist for nerve conduction studies and a consultative evaluation. (R. 201.)

Plaintiff underwent nerve conduction studies in November 1997. The right median sensory study revealed early to mild carpal tunnel syndrome. All other sensorimotor studies were reportedly normal with no evidence of left carpal tunnel syndrome or diffuse neuropathy. (R. 166.)

Pursuant to Dr. McVeigh's referral, Dr. Bipid Shah evaluated Plaintiff in December 1997 to assess her complaints of neck, shoulder, and upper extremity pain. As part of the consultation, Dr. Shah reviewed records of Plaintiff's "complete physical and medical background." Dr. Shah noted that, although Plaintiff complained of predominantly right sided paresthesias in her upper extremities, her symptoms were

somewhat inconsistent with carpal tunnel syndrome in that she did not report any "radicular pain going into one particular dematome or myotome." Additionally, pain was noted to be "somewhat diffuse" and mostly in the neck and shoulder region. Dr. Shah's examination of Plaintiff revealed "fairly good strength in various muscle groups of [the] upper extremities." Plaintiff's reflexes were only slightly diminished in her biceps, triceps, and brachio-radialis. Sensory examination was intact with some slight diminishing over the tips of Plaintiff's fingers, particularly over the median nerve distribution on the right side. The remainder of the neurological examination was unremarkable.

Dr. Shah reviewed the nerve conduction studies performed in November and opined that they revealed carpal tunnel syndrome on the right side. However, he further opined that her pain and parasthesias was at least partially attributable to the problems caused by her large breasts. Dr. Shah also reviewed an MRI of Plaintiff's cervical spine and opined that the MRI revealed some degenerative changes but "there does appear to be adequate room for the spinal cord at all levels and [there was no] definite evidence of a disc herniation." As such, Dr. Shah recommended conservative treatment and noted that if, after breast reduction surgery, Plaintiff's pain and numbness persisted, she may need to pursue additional treatment for her carpal tunnel syndrome. (R. 173-74.)

Following her consultative examination with Dr. Shah, Plaintiff returned to Dr. McVeigh in March 1998 for treatment of nerve root compression at both shoulders due to heavy indentations caused by Plaintiff's bra straps due to her heavy breasts. Dr. McVeigh noted that Plaintiff had completed the recommended physical therapy and had also been using a special therapeutic bra. Apparently, the bra was prescribed to help

alleviate the strain that regular bra straps placed on her shoulders. Plaintiff reported "markedly reduced" symptoms pursuant to the therapy and new bra. Dr. McVeigh recommended that Plaintiff should continue physical therapy because the treatment "appeared to help considerably." (R. 200.) Plaintiff returned a month later in April 1998 and Dr. McVeigh noted his impression that she had osteoarthritis in her hands and in the acromio-clavicular joint of her right shoulder. His plan was for her to continue taking her current medications and return for a follow up visit in six months. (R. 264.)

Plaintiff had her gall bladder removed in October 1998. A post-operative neurological examination was unremarkable. (R. 250.)

In January 1999, Dr. Rosenfeld noted that Plaintiff reported having a great summer and fall but that cold weather caused her hands to ache and "turn[ed] her fingers pale." Examination revealed tenderness and slight swelling but good range of motion in her hands. Dr. Rosenfeld recommended glucosamine for her joint symptoms. (R. 262.) In August 1999, Dr. Rosenfeld saw Plaintiff again and noted that she had been "doing well" with respect to her joints. Glucosamine reportedly helped Plaintiff's hand symptoms. (R. 262.)

In December 1999, Plaintiff reported to Dr. Jane Kjoller with complaints of "cold pains" in her fingers. Plaintiff advised that her hands tend to get very cold and change color. (R. 433.)

Plaintiff returned to Dr. Rosenfeld for a follow up visit in April 2000 reporting that, other than falling down and breaking a finger, she felt great while on a recent trip to

Florida. After examining Plaintiff, Dr. Rosenfeld opined that Plaintiff's osteoarthritis of her hands and knees was "stable." (R. 263.)

In May 2000, Dr. Kjoller's examination of Plaintiff revealed no swelling in her extremities. Dr. Kjoller's impression was that Plaintiff had insomnia secondary to nerves and an "active life." (R. 431.) Later that month, Dr. Kjoller saw Plaintiff again and noted that she "look[ed] well" and was "bright, alert, [and] laughing." Neurological examination was within normal limits and examination of Plaintiff's extremities was unremarkable. (R. 430.)

Plaintiff initiated treatment with Dr. Victoria Torralba, a rheumatologist, in November 2000. Plaintiff saw Dr. Torralba several times between November 2000 and January 2004 for treatment of scleroderma and rheumatoid arthritis. (R. 343-78.) Dr. Torralba diagnosed Plaintiff with moderate to severe degenerative joint disease of the fingers in November 2000 (R. 385) and with rheumatoid arthritis in April 2002. (R. 343.) In March 2003, Plaintiff reported with complaints of pain and swelling of her hands and right wrist. Plaintiff advised Dr. Torralba that she had been playing "18 hole golf for almost a week and developed this pain a few days later." (R. 360.) In April 2003, Plaintiff advised that she was "doing okay" with her arthritis. Examination revealed that her hand swelling had decreased significantly. (R. 358.) Later that month, Plaintiff returned for additional treatment and reported that her arthritis was "good." Examination revealed decreased swelling and tenderness in Plaintiff's hands. Dr. Torralba noted that, other than putting on her socks, Plaintiff was capable of fine manipulation. (R. 356-57.)

Two non-examining state agency physicians reviewed Plaintiff's file to assess her physical residual functional capacity. In February 2004, Dr. Donald Morford opined that Plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for about six hours in an eight hour workday; sitting (with normal breaks) for about six hours in an eight hour workday; pushing / pulling with her upper and lower extremities without limitation; and climbing, balancing, stooping, kneeling, crouching, and crawling occasionally. He further found Plaintiff to have no manipulative, visual, or communicative limitations. Dr. Morford noted that "it does not appear that [Plaintiff] understands the DLI issue. Her complaints appear to be current ones." (R. 412-18.)

Dr. Thomas Edwards, the second non-examining state agency physician, reviewed Plaintiff's file in April 2004 and opined that Plaintiff was capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking for about six hours in an eight hour workday; sitting (with normal breaks) for about six hours in an eight hour workday; and pushing / pulling without limitation. Dr. Edwards also imposed postural limitations. He found Plaintiff capable of never climbing ladders, ropes and/or scaffolds; frequent balancing; and only occasional climbing of ramps/stairs, stooping, kneeling, crouching and/or crawling. Like Dr. Morford, Dr. Edwards also found Plaintiff to have no manipulative limitations. (R. 439-45.)

Between March and May 2006, Dr. Robert Salzman, a rheumatologist, independently reviewed the medical evidence of record and responded to written interrogatories propounded on him by the Social Security Administration and Plaintiff's

counsel. (R. 758-66.) Dr. Salzman acknowledged that the medical evidence established that Plaintiff had osteoarthritis in the PIP and DIP joints of her hands, but opined that the medical evidence did not support Plaintiff's allegations of neuropathy and pain because there was no evidence of any potential causes of the neuropathy, no documented motor problems, and Plaintiff's nerve conduction studies were within normal limits except for identifying mild right carpal tunnel syndrome. (R. 758, 760-61.) Noting the results of Plaintiff's complete physical examination on August 19, 1997, Dr. Salzman further opined that none of Plaintiff's impairments were significant enough prior to Plaintiff's date last insured to prevent her from working on a regular and sustained basis. (R. 766.)

Dr. Salzman also completed a form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" in which he opined that Plaintiff was capable of lifting and/or carrying without limitation, standing and/or walking for about six hours in an eight hour workday, and sitting without limitation. With respect to postural limitations, he opined that Plaintiff was capable of climbing, balancing, and stooping frequently and kneeling, crouching, and/or crawling occasionally. He found Plaintiff had no manipulative, visual or communicative limitations. (R. 762-65.)

### Plaintiff's Activities of Daily Living

Evidence of Plaintiff's activities of daily living appears throughout the record including: Plaintiff's correspondence with the Social Security Administration, various treatment notes, and in Plaintiff's testimony during her hearing before the ALJ on January 20, 2006. (R. 767-81.)

The evidence of record documents that Plaintiff has led a fairly active lifestyle since 1993. For example, she travels frequently. In 1995, Plaintiff traveled to Europe for five weeks to visit relatives in the Netherlands. (212-13, 255, 779-80.) Between 1993 and 2003, Plaintiff's medical records document regular trips back and forth between her residences in New York and Florida. (R. 176, 199, 260, 316, 350, 354, 371.) In June 1993, she traveled to Baltimore, Maryland. (R. 269.) In 2005, she went to Las Vegas with friends for three days. (R. 780.)

Plaintiff was also reportedly an active golfer. In fact, during two different visits with her treating rheumatologist in February 2003—more than four years after her date last insured—Plaintiff advised that she was "hitting the ball really well .. . and really plays golf well now." During the hearing, she testified that, during the relevant time period, she played golf on a weekly basis. (R. 776.)

In addition to golfing, Plaintiff informed her treating physician that she was also capable of doing other activities such as housework, and laundry. (R. 362, 364.) Plaintiff also testified that she "pass[ed] the time of day" on her computer. (R. 776.) This type of activity is consistent with another medical report from June 2001 which noted that Plaintiff called in to report low back pain after pushing heavy bags of leaves. (R. 425.)

Notwithstanding her apparent ability to engage in such activities, in her correspondence with the Social Security Administration, Plaintiff nonetheless alleged that she has difficulty picking things up with her hands (R. 67-75), frequently drops things,  is unable to grip and/or open jars, and has difficulty dressing because she needs help buttoning as well as with putting on socks and shoes. (R. 95-97.)

In addition, she testified that, between June 1993 and December 1998 (hereinafter "the relevant time period"), she was experiencing a lot of pain in her hands and arms. (R. 773.) As a result of this pain, Plaintiff testified that she lacks the strength to lift more than five to ten pounds at a time. (R. 776.) Although Plaintiff was ambulating with a walker at the time of the hearing, she testified that she used a cane during the relevant time period. (R. 777.) Plaintiff also testified that she engaged in a wide range of social activities between 1993 and 1998. She socialized with friends, played cards, and went to lunch. In addition, about once a year, she would entertain relatives from the Netherlands. (R. 777-79.)

## IV. <u>DISCUSSION</u>

**A. The ALJ Properly Assessed the Functional Limitations Arising from Plaintiff's Hand Impairments.**

Plaintiff challenges the ALJ's assessment of her RFC as being inconsistent with his conclusion at step two of the sequential analysis that her mild degenerative joint disease of the hands with mild right carpal tunnel syndrome was a "severe" impairment. Specifically, Plaintiff argues that the ALJ erroneously found her to have no manipulative limitations. According to Plaintiff, if Plaintiff's hand impairments are considered "severe" at step two of the sequential analysis, "by definition, they must have some impact on the Plaintiff's ability to perform work related activities." (Doc. 19 p.7.) Plaintiff apparently misunderstands the significance of this threshold inquiry. At step two, the threshold for

meeting the definition of a "severe impairment" at step two is low and so only claims based on the most trivial impairments are rejected.[23]

The mere fact that the ALJ concluded that Plaintiff suffered from an impairment which *may* cause a particular functional limitation does not necessarily direct the conclusion that the impairment actually *does* in fact cause such a limitation. The burden is on the Plaintiff to produce evidence demonstrating the functional impact—if any—caused by her medically determinable impairments. The ALJ carefully considered all of the medical evidence of record and found no evidentiary support for Plaintiff's alleged inability to grip, handle, and reach during the relevant time period. Notably, Plaintiff's medical records for the relevant time period do not offer much—if any—information related to any functional limitations associated with Plaintiff's hand impairments. Other than the mildly abnormal nerve conduction studies demonstrating early to mild right carpal tunnel syndrome and hand x-rays showing mild degenerative changes, Plaintiff's medical records from the relevant time period document little more than Plaintiff's subjective complaints, diagnoses, and predominantly benign clinical findings.

Although some of her examining physicians occasionally noted swelling in the PIP and DIP joints of her hands, none of the treatment notes reflect that Plaintiff was demonstrating any sensorimotor deficits, impaired grip strength, or muscle atrophy in her hands during the relevant time period. (R. 173-74, 262, 265.) To the contrary, neurological examinations were consistently unremarkable and, during a consultative

---

[23] *See* <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986).

examination with a neurologist in December 1997, the examining neurologist noted "fairly good strength" in Plaintiff's upper extremities with only slightly diminished reflexes. (R. 173-74, 250.) In addition, multiple treatment notes during the relevant time period document that Plaintiff's symptoms had stabilized and/or were "markedly reduced" via conservative treatment such as physical therapy, use of a therapeutic bra, and medications. (R. 200, 204, 262-63, 265.)

Further, while the burden was on Plaintiff to produce evidence that her medical conditions caused functional limitations which interfered with her ability to work during the relevant time period, she failed to provide medical source statements from any of the physicians who treated her prior to her date last insured. Instead, Plaintiff offered medical source statements from Dr. Kjoller and Dr. Torralba—treating physicians who did not begin treating Plaintiff until well after the expiration of Plaintiff's date last insured. Therefore, to the extent Dr. Kjoller and Dr. Torralba's opinions were intended to comment on Plaintiff's functional capacity during the relevant time period, the opinions necessarily were speculative and conclusory.[24]

In January 2004, Dr. Torralba opined that Plaintiff "may never be able to go into any gainful employment which will require the use of her arms and legs." (R. 343.) In addition to having limited value due to the fact that Dr. Torralba did not begin treating Plaintiff until November 2000, Dr. Torralba's opinion is further undermined by the fact that it is inconsistent with her own treatment notes. For example, in the medical reports

---

[24] Malak v. Astrue, 246 Fed. Appx. 482 (9th Cir. 2007) (finding retrospective opinion of physician necessarily was conclusory and speculative where he did not treat Plaintiff until after the expiration of DLI).

corresponding with Plaintiff's office visits in March and April 2003, Dr. Torralba notes that Plaintiff had been regularly playing golf. (R. 358, 360.) Moreover, in April 2003—over four years after Plaintiff's date last insured, and three years after Dr. Torralba diagnosed Plaintiff with moderate to severe degenerative joint disease of the fingers—Dr. Torralba noted an improvement in Plaintiff's hand symptoms and opined that with the exception of putting on socks, Plaintiff was "capable of fine manipulation." (R. 356-57.)

Similarly, in a letter dated February 2004, Dr. Kjoller stated that "since [she has] known [Plaintiff], [Plaintiff's] been severely limited in her activity by pain, weakness . . . and decreased mobility of her left arm." (R. 420.) However, in May 2000, Dr. Kjoller noted her impression that Plaintiff was suffering from insomnia secondary to nerves and an "active life." (R. 431.)

In sum, Plaintiff failed to meet her burden of producing evidence to support the functional limitations she alleged were associated with her hand impairments. Moreover, the ALJ's determination that Plaintiff had no manipulative limitations as a result of her various impairments during the relevant time period is well supported by the objective medical evidence of record as well as Plaintiff's reported activities of daily living. Further, and contrary to Plaintiff's argument that the ALJ's assessment of her RFC fails to incorporate any limitations associated with her hand impairments, although the ALJ did not find Plaintiff to have any manipulative limitations, he did limit her to pushing and/or pulling up to twenty pounds with her upper extremities. (R. 22.) Thus, because Plaintiff did not provide medical evidence to support any additional limitations

attributable to her mild degenerative joint disease of the hands with mild right carpal tunnel syndrome during the relevant time period, the ALJ appropriately considered the impact of Plaintiff's hand impairments when assessing her RFC.

**B.     The ALJ Properly Considered Plaintiff's Subjective Complaints.**

Plaintiff also argues that the ALJ failed to properly credit Plaintiff's subjective complaints concerning her inability to use her hands due to pain. In evaluating a disability, the ALJ must consider all of a claimant's impairments, including her subjective symptoms, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[25] Where, as here, an ALJ decides not to credit a claimant's testimony about subjective complaints concerning the intensity, persistence, and limiting effects of symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[26] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[27]

The ALJ articulated specific reasons for rejecting Plaintiff's credibility as to the limiting effects of her symptoms, which reasons are supported by substantial evidence in the record. First, and as noted by the ALJ, Plaintiff's activities of daily living during the relevant time period were inconsistent with a totally incapacitating condition. Plaintiff's

---

[25] 20 C.F.R. § 404.1528.

[26] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Dep't of Health & Hum. Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[27] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

self-reported activities—including international travel for extended periods of time—though not conclusive, are inconsistent with the alleged severity and limiting effects of Plaintiff's symptoms. For example, Plaintiff testified that she golfed on a weekly basis during the relevant time period. She also testified that she played cards with her friends and regularly used her computer to "pass the time of day." Such activities are inconsistent with her allegations that it was difficult for her to pick things up with her hands and that she frequently dropped things due to lack of strength in her upper extremities. The reported activities also undermine her testimony that her impairments interfere with her ability to grip things. Contrary to Plaintiff's testimony that she was only able to lift or carry objects weighing between five and ten pounds during the relevant time period, she reportedly was able to do housework, laundry, and handle heavy bags of leaves.

Most of Plaintiff's self-reported limitations do not appear to relate specifically to the limitations Plaintiff actually experienced between the date she alleged onset of her disability and the date she was last insured. In fact, the problems appear to be the result of a deterioration of her overall condition that did not occur until long after her date last insured. Indeed, one of the non-examining state agency physicians noted in his assessment of Plaintiff's allegations in relation to the medical evidence of record that he felt Plaintiff misunderstood the concept of "date last insured."

Although Plaintiff alleged that she had incapacitating pain and numbness in her upper extremities during the relevant time frame, her medical records for that period of time do not support her subjective complaints. Pain is a symptom that *may* cause

functional limitations. However, allegations of pain must be considered with other evidence in the record to determine the extent to which they impact a claimant's ability to perform work related activities. Here, the ALJ found Plaintiff's medical impairments and the resulting symptoms—including her allegations of hand pain—limited Plaintiff to the exertional demands of light work during the relevant time period.

In reaching this finding, the ALJ relied on medical evidence from various treating medical providers. In particular, the ALJ noted that he gave great weight to the opinion of Dr. Salzman, an impartial medical expert in the field of rheumatology. Dr. Salzman reviewed all of the medical evidence of record and concluded that Plaintiff's hand impairments did not interfere with her ability to engage in lifting, carrying, pushing and/or pulling activities. In reaching this conclusion, Dr. Salzman noted that nerve conduction studies were within normal limits except for revealing mild right carpal tunnel syndrome. He also noted that Plaintiff underwent a complete physical examination during the relevant time period and it was unremarkable.

Lastly, the ALJ did not reject Plaintiff's subjective testimony all together. Instead, the ALJ acknowledged that Plaintiff's impairments *could* produce pain and limitations—just not of the severity claimed by Plaintiff. The ALJ opined that Plaintiff's own perspective of her condition *during the relevant time period* was likely clouded by the time lapse between the date of her alleged onset of disability and the date she ultimately filed for benefits (ten years later) as well as by the significant deterioration in her overall condition that occurred years after her date last insured.

In sum, the ALJ determined that Plaintiff's allegations of incapacitating pain and numbness in her upper extremities were inconsistent with her self-reported activities of daily living, and the objective medical evidence of record. Accordingly, for these reasons, the Court concludes that the ALJ articulated specific and adequate reasons, which are fully supported by the evidence of record, for finding Plaintiff's subjective complaints were not fully credible.

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 25, 2009.

Copies to:
    All Counsel

GARY R. JONES
United States Magistrate Judge